No. 49,762

STATE OF KANSAS, *Appellee and Cross-Appellant,* v. JAMES E. FAR-
LEY, *Appellant and Cross-Appellee.*

(587 P.2d 337)

Opinion filed December 9, 1978.

*John C. Humpage,* of Topeka, argued the cause and was on the brief for
appellant and cross-appellee.

*Ronald E. Wurtz,* assistant district attorney, argued the cause and *Curt T.
Schneider,* attorney general, and *Gene M. Olander,* district attorney, were with
him on the brief for appellee and cross-appellant.

The opinion of the court was delivered by

HOLMES, J.: Defendant James E. Farley was charged in district
court with one count of second degree murder (K.S.A. 21-3402)
and found guilty by a jury of the lesser included offense of
voluntary manslaughter (K.S.A. 21-3403). He received a sentence
of not less than five nor more than twenty years. Defendant
appeals.

On March 17, 1977, one Kenneth Chilcoat was shot and killed
in the living room of the appellant's home in Topeka. Chilcoat
and appellant were next door neighbors although the evidence
indicated they were not personally acquainted. On the evening in
question, appellant's two minor sons, ages nine and thirteen, and
some other children were playing hide-and-seek in the neigh-
borhood. Mrs. Chilcoat noticed some children window-peeking
at her bedroom window and so advised her husband. He slipped
from the house and caught Michael Farley, the nine-year-old son
of the appellant. Chilcoat was nude from the waist up and was
not wearing any shoes at the time. After catching Michael, he held
him and took him to the Farley house where he entered the living
room. Michael's mother, hearing a commotion and disturbance in
the living room, came from the back part of the house and found
Chilcoat standing in her living room with Michael in tow. Mi-

chael was crying and according to testimony of he and Mrs. Farley, Chilcoat was cursing, holding Michael around the neck and threatening to kill both Michael and his mother. Mrs. Farley did not recognize Chilcoat as being her next door neighbor. She asked what was wrong, requested Chilcoat to release Michael and when the cursing and threats continued, she excused herself saying something was burning on the stove. She ran to a back bedroom and called her husband at Sears where he was employed as merchandise manager. She told her husband that a strange man had broken into the house, was holding Michael and threatening to kill them. Appellant said he would be right home and told her to call the police. As he left the store, appellant obtained a shotgun and some shells. On his arrival at home, he noticed the police had not arrived so he loaded the shotgun, went in through his front door and found his wife and two sons in tears with Michael still in the grasp of Chilcoat, whom he did not recognize as being the next door neighbor. From this point on the only persons who know what happened are appellant, Mrs. Farley and their two children, Michael and Tyrone. The testimony of the four Farleys indicate the appellant tried to reason with Chilcoat, asked Chilcoat repeatedly to release Michael; asked Chilcoat to step outdoors and discuss the matter so he (Farley) could find out what had happened but that Chilcoat continued cursing and making threats against the Farleys. Appellant was holding the shotgun in an up and down position in front of his chest when Chilcoat finally released Michael. Chilcoat started to move from the area and having his hands raised in front of him, grabbed the shotgun, which discharged, resulting in Chilcoat's death. Appellant immediately expressed dismay at what had happened and asked his wife to call an ambulance and the police. Upon arrival of police officers, all four members of the Farley family were taken to police headquarters for questioning.

Appellant raises several points on appeal. In his first point he argues the trial court committed prejudicial error by permitting the state to impeach two of its own witnesses. Michael and Tyrone Farley were interrogated the night of the shooting by juvenile officer Terry Jones, who then wrote out in longhand a resumé of summation of what she understood the children told her. The statements were not claimed to be verbatim transcripts of the statements of the children but were the officer's summaries

of the two interrogations. Michael and Tyrone Farley were called as witnesses for the state and their testimony varied somewhat from Officer Jones' version of her interviews with them on the night of the shooting. The variance concerned whether it was appellant or the deceased who suggested they go outside and discuss what had happened and whether the deceased grabbed the gun held by appellant or merely made some motion toward appellant, who then pointed the gun at the victim, firing the fatal shot. The inconsistency in the manner in which the victim received the fatal shot provided the only evidence to support the state's theory that the homicide was not accidental or the result of self-defense. Officer Jones was called as the final witness for the state and the previous statements of Michael and Tyrone were introduced in evidence over the objection of the defendant. The statements were also used to impeach the witnesses during their direct examination by the state.

Appellant argues that a party cannot impeach his own witness absent surprise and that to allow the statements of Michael and Tyrone resulted in the admission of substantive evidence which would otherwise have been inadmissible. Michael had previously testified in the preliminary hearing contrary to the unsworn statement prepared by Officer Jones and appellant also argues that the state knew Tyrone would repudiate his alleged prior statement. Under these circumstances, the appellant contends the only reason for calling Michael and Tyrone as witnesses was to lay the foundation for placing in evidence their otherwise inadmissible statements. Appellant relies heavily on *State v. Potts,* 205 Kan. 47, 468 P.2d 78 (1970) and *United States v. Morlang,* 531 F.2d 183 (4th Cir. 1975). In *Potts* we said:

"It is the rule in this state that where it appears a party is genuinely surprised by adverse testimony from his own witness, the trial court may, in its discretion, allow the party calling the witness to cross-examine and to interrogate him as to prior contradictory statements." p. 51.

Appellant contends that as the state knew both boys would repudiate portions of the alleged prior statements, there could be no genuine surprise when they did so.

Appellant also lends federal support to his argument by asking this court to adopt the philosophy of the United States Court of Appeals in *United States v. Morlang,* 531 F.2d 183 (4th Cir. 1975), which found reversible error in the trial court permitting

the prosecution to impeach its own witness by the use of a prior inconsistent statement. In *Morlang* the prosecution apparently knew that the witness would deny making the prior statement. The court noted:

"We are of the opinion that the court erred in permitting the prior statement of Wilmoth to be introduced. While it is the rule in this circuit that a party calling a witness does not vouch for his credibility, *United States v. Norman*, 518 F.2d 1176 (4th Cir. 1975), it has never been the rule that a party may call a witness where his testimony is known to be adverse for the purpose of impeaching him. To so hold would permit the government, in the name of impeachment, to present testimony to the jury by indirection which would not otherwise be admissible. The courts have consistently refused to sanction such a practice.

. . . . .

"We, of course, recognize that the strict rule against impeaching one's own witness has long been discredited. *E.g., Young v. United States*, 97 F.2d 200 (5th Cir. 1938). It is now generally recognized that impeachment may be resorted to where the trial court, in its discretion, determines that it is necessary to alleviate the harshness of subjecting a party to the mercy of a witness who is recalcitrant or who may have been unscrupulously tampered with. *United States v. Coppola,* 479 F.2d 1153 (10th Cir. 1973). The overwhelming weight of authority is, however, that impeachment by prior inconsistent statement may not be permitted where employed as a mere subterfuge to get before the jury evidence not otherwise admissible.

"Witnesses may, of course, sometimes fail to come up to the expectations of counsel and in such situations there is an understandable temptation to get before the jury any prior statement made by the witness. And it may be that in certain instances impeachment might somehow enhance the truth-finding process. Yet, whatever validity this latter assertion may have, it must be balanced against the notions of fairness upon which our system is based. Foremost among these concepts is the principle that men should not be allowed to be convicted on the basis of unsworn testimony. *Bridges v. Wixon*, 326 U.S. 135, 153-54, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945).

"We must be mindful of the fact that prior unsworn statements of a witness are mere hearsay and are, as such, generally inadmissible as affirmative proof. The introduction of such testimony, even where limited to impeachment, necessarily increases the possibility that a defendant may be convicted on the basis of unsworn evidence, for despite proper instructions to the jury, it is often difficult for them to distinguish between impeachment and substantive evidence. Accord *United States v. Coppola*, 479 F.2d 1153 (10th Cir. 1973); *Taylor v. Baltimore & Ohio R.R. Co.*, 344 F.2d 281 (2nd Cir. 1965). Thus, the danger of confusion which arises from the introduction of testimony under circumstances such as are presented here is so great as to upset the balance and warrant continuation of the rule of exclusion. *Shepard v. United States*, 290 U.S. 96, 104, 54 S.Ct. 22, 78 L.Ed. 196 (1933).

. . . . .

". . . Despite the fact that impeachment of one's own witness may be permitted, this does not go so far as to permit the use of the rule as a subterfuge to

get to the jury evidence otherwise inadmissible." *United States v. Morlang,* 531 F.2d at 189-190.

See also *United States v. Rogers,* 549 F.2d 490, 497 (8th Cir. 1976); *United States v. Shoupe,* 548 F.2d 636 (6th Cir. 1977); *United States v. Coppola,* 479 F.2d 1153 (10th Cir. 1973); *United States v. Dobbs,* 448 F.2d 1262, 1263 (5th Cir. 1971); *United States v. Johnson,* 427 F.2d 957, 961 (5th Cir. 1970); *Bushaw v. United States,* 353 F.2d 477, 481 (9th Cir. 1965), *cert. denied* 384 U.S. 921 (1966).

The state, of course, contends there was no error in the admission of the prior inconsistent statements of Michael and Tyrone. K.S.A. 60-420 provides:

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

Judge Gard states in his comments on the statute:

"[T]his section does not impose any drastic change upon the Kansas procedure. The principal effect of it is to state a rule much less arbitrary than the former. The right to impeach one's own witness, in the interest of the ends of justice and adequate inquiry into the facts, is now stated as the rule rather than the exception, subject to the discretionary control of the trial court as provided in section 60-445. Here, as in a number of other instances in this article, the doubts are resolved in favor of rather than against admissibility of information which would go to the real weight of the witness' testimony. The witness is truly made the witness of the court rather than a mouthpiece to be charged to the account of the party producing him.

"In common sense it would seem that if a witness has been bribed to change his story, or if he has made previous statements which are contradictory to his testimony, he should be subject to impeachment regardless of who calls him, by whatever means are available for impeachment purposes. To require a showing of surprise, hostility, or deceit is hardly necessary, as it will only be where one of those factors occurs that there will be any need or desire to impeach the witness whom the party has called. In any event the trial judge will have control over it." Gard's Kansas C. Civ. Proc. § 60-420 (1963).

In *State v. Fisher,* 222 Kan. 76, 563 P.2d 1012 (1977), the defendant was convicted of the crime of indecent liberties with a child and aggravated sodomy growing out of alleged incidents involving his eleven-year-old stepdaughter. At the time of trial the child completely recanted her prior statements given to police and as a result the trial court allowed police officers to testify as to the child's prior inconsistent statements. On appeal, we held that

as the child had been called as a witness and subjected to cross-examination prior to the admission of her prior inconsistent statements to police, the court did not abuse its discretion in allowing the otherwise inadmissible statements. We find no error in the admission of the statements of Michael and Tyrone, although we wish to emphasize that the trial court should exercise extreme caution in the admission of statements of young children when the statements have been taken under circumstances of extreme emotional stress, as in the case at bar, without the presence of the child's parents or others of mature judgment. The trial court could very well have refused the admission of the statements in question without having abused its discretion.

In his second point on appeal appellant argues the impeachment by the prosecution of its own witnesses denied him a fair trial. In view of the discussion above concerning the admission of the prior inconsistent statements, we find no merit in appellant's second point.

As a third point, appellant argues that he was not furnished copies of Officer Jones' handwritten statements until during trial, resulting in the denial of a fair trial. It appears Officer Jones had furnished typewritten statements to the prosecution, copies of which were made available to appellant's counsel. It was not until during the trial that either counsel became aware that Officer Jones had handwritten the original statements and kept them in her possession. She contended that each of the Farley boys had pointed out an error in his statement and then initialed a change requested by the boy. Both boys denied the statements were correct and testified they refused to sign them. The handwritten statements were made available to defense counsel during trial when the prosecution became aware of them and we find no prejudicial error in the failure to provide them sooner. See *State v. Walker*, 221 Kan. 381, 559 P.2d 381 (1977); K.S.A. 22-3213; *State v. Kelly*, 216 Kan. 31, 531 P.2d 60 (1975).

Appellant's fourth point on appeal concerns the instructions given the jury. The appellant's theory of his defenses was twofold. First, he contended the shooting was accidental and in the alternative, if the jury disbelieved the accident theory, that the killing was justified as self-defense, defense of others or defense of dwelling. The trial court instructed on the crime of involuntary manslaughter and appellant's theory of self-defense as follows:

"No. 3

"If you find the defendant is not guilty of voluntary manslaughter, then you shall consider whether he is guilty of involuntary manslaughter.

"To establish the charge of involuntary manslaughter, each of the following elements of the offense must be proved beyond a reasonable doubt:

"1.  That the defendant unintentionally killed Kenneth L. Chilcoat;

"2.  That it was done while the defendant was defending himself or members of his family against an aggressor in an unlawful manner by using greater force than was justified in defending against the aggressor; and

"3.  That this act occurred on or about March 17, 1977, in Shawnee County, Kansas."

"No. 4

"A person is justified in the use of force to defend himself or members of his family against an aggressor's imminent use of unlawful force to the extent it appears reasonable to him under the circumstances then existing."

"No. 4A

"A person is justified in the use of force to prevent another person ·from unlawfully entering into or damaging his dwelling to the extent it appears reasonable to him under the circumstances then existing."

## K.S.A. 21-3404 provides in part:

"Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner."

## K.S.A. 21-3201(3) defines wanton conduct as:

"Wanton conduct is conduct done under circumstances that show a realization of the imminence of danger to the person of another and a reckless disregard or complete indifference and unconcern for the probable consequences of such conduct. The terms 'gross negligence,' 'culpable negligence,' 'wanton negligence' and 'recklessness' are included within the term 'wantonness' as used in this code."

Instruction No. 3 furnished no basis for the jury to consider whether the killing was done unintentionally in the commission of a lawful act in a wanton manner. The evidence was such that the jury might have found the defendant not guilty based upon a finding of accidental death or guilty of involuntary manslaughter based upon wanton conduct consisting of negligence or recklessness as defined in K.S.A. 21-3201(3). The instruction on involuntary manslaughter was insufficient to present one of appellant's theories of defense to the jury.

Instructions 4 and 4A conform with those in PIK Crim. 54.17 and 54.18 and have generally been approved by this court. See *State v. Woods,* 222 Kan. 179, 563 P.2d 1061 (1977); *State v. Beard,* 220 Kan. 580, 552 P.2d 900 (1976); *State v. Duckworth,*

219 Kan. 619, 549 P.2d 554 (1976); *State v. Weyer*, 210 Kan. 721, 504 P.2d 178 (1972). However, based upon the facts in this case, we find the instructions lacking in view of the statutory provisions on self-defense and the appellant's theory in this case.

K.S.A. 21-3212 provides:

"A person is justified in the use of force against another when and to the extent that it appears to him and he reasonably believes that such conduct is necessary to prevent *or terminate* such other's unlawful entry into or attack upon his dwelling." (Emphasis added.)

One of appellant's theories of defense was that he was attempting to *terminate* Mr. Chilcoat's unlawful entry into his dwelling. The instruction given by the trial court only permitted the jury to consider whether appellant was justified in the use of force to prevent another person from unlawfully *entering into or damaging* his dwelling. The appellant testified that several times he asked Mr. Chilcoat to leave the house. Mrs. Farley and the children corroborated this. The evidence is undisputed that by the time appellant reached his home the deceased was already present in appellant's living room and thus instruction number 4A is inapplicable to his defense since he was not attempting to keep Mr. Chilcoat from *entering.* Neither is there any evidence to indicate that appellant was attempting to prevent Mr. Chilcoat from *damaging* his dwelling. Thus, although appellant presented evidence tending to show he was justified in attempting to terminate Mr. Chilcoat's unlawful entry, and the statute specifically allows such a theory as a defense, the jury was precluded from considering this aspect of appellant's theory of defense. Under the facts in this case, the instruction was not a complete and accurate statement of the law as set forth in K.S.A. 21-3212 and was clearly erroneous.

We find the instructions relating to appellant's theories of defense to be clearly erroneous based upon the factual situation in this case and the judgment of the trial court must be reversed. In view of the decision reached, it is not necessary to consider further the appellant's other points, which would not ordinarily arise in a second trial, or the issue raised by cross-appeal of the state.

The judgment of the trial court is reversed and the case remanded for a new trial.